[S. F. No. 11791. In Bank.—December 28, 1927.]

TIFFANY & COMPANY (a Corporation), Appellant, v.
JOHN D. SPRECKELS, Sr., et al., as Executors, etc.,
Respondent.

[1] CONTRACTS—HUSBAND AND WIFE—LIVING SEPARATE AND APART—
GUARANTY OF WIFE'S DEBT BY HUSBAND—EXECUTION OF AGREE-
MENT UNDER THREAT OF PROSECUTION—VOID CONTRACT.—Where a
husband, who was estranged and living separate and apart from
his wife, entered into a ' contract in which he agreed, in the
event of the wife's default in making installment payments on the
purchase price of certain articles purchased by her, to accept
full responsibility therefor and discharge the unpaid balance of
the debt, which contract was entered into by the husband to
prevent a threatened prosecution of the wife by the seller of the
goods on a charge of conspiracy to defraud in the purchase, the
contract was void and unenforceable.

[2] ID.—UNEXECUTED CONTRACT—LACK OF CONSIDERATION.—Where the
draft of a written contract, in such case, purporting to be
between the husband and wife, was signed by the husband but
not by the wife, who never assented to it, it had no binding
effect upon the wife; and if it be considered as an agreement
for the benefit of the seller of the goods, there was no considera-
tion to support it, where the seller parted with nothing of value
nor suffered any detriment by the transaction between it and the
husband, and the contract did not even provide for an extension
of the time of payment of the claim against the wife; and the
fact that the seller did in fact forbear to sue, without any agree-
ment of forbearance, did not constitute a consideration.

[3] ID.—AGREEMENT FOR CUSTODY OF MINOR CHILD—VALIDITY OF.—
A provision in such an agreement that if the wife should default
in payments and the husband was called upon to discharge the
debt, the wife should renounce all claim to the custody of the
minor child of the parties in favor of the husband, this provision

1. Contract procured by threats of prosecution of a relative,
notes, 26 L. R. A. 48; 20 L. R. A. (N. S.) 484; 37 L. R. A. (N. S.)
539; L. R. A. 1915D, 1118. See, also, 6 Cal. Jur, 65; 9 R. C. L. 716.
What is duress sufficient to invalidate a contract, note, 26 Am. Dec.
370. See, also, 7 R. C. L. 715.

2. See 6 Cal. Jur. 174; 6 R. C. L. 659.

3. Validity of contracts transferring parental custody of child,
notes, 88 Am. St. Rep. 866; 6 Ann. Cas. 939; 11 Ann. Cas. 217;
Ann. Cas. 1913B, 886; 27 L. R. A. (N. S.) 56; 42 L. R. A. (N. S.)
1014. See, also, 9 Cal. Jur. 793; 20 R. C. L. 603.

being the consideration for the husband's agreement to accept responsibility for payment of the wife's debt, is legal and is a sufficient consideration to support the agreement, as parents have a legal right to contract with each other as to the custody and control of their offspring, subject to the control of the court in proceedings wherein the welfare of the child is involved.

(1) 4 C. J., p. 878, n. 81; 13 C. J., p. 404, n. 20, p. 779, n. 26. (2) 13 C. J., p. 347, n. 79, p. 348, n. 84, p. 713, n. 53.    (3) 29 Cyc., p. 1589, n. 51.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Walter Perry Johnson, Judge. Affirmed.

The facts are stated in the opinion of the court.

Knight, Boland & Christin for Appellant.

Morrison, Dunne & Brobeck, Dunne, Dunne & Cook and Dunne, Brobeck, Phleger & Harrison for Respondent.

CURTIS, J.—Action brought to recover upon a claim against the estate of John D. Spreckels, Jr., deceased. The claim was based upon an agreement whereby, it is contended, the deceased guaranteed the payment to appellant of the sum of £16,500, lawful money of the kingdom of Great Britain (equal to $80,350 in lawful money of the United States), being the cost price of a pearl necklace purchased of appellant by the wife of the deceased. It is undisputed that Mrs. Spreckels on or about the third day of June, 1920, purchased from Tiffany & Company at London, England, a pearl necklace, and agreed to pay therefor the sum of £16,500. The necklace was delivered to Mrs. Spreckels and she signed a receipt therefor. Shortly thereafter representatives of Tiffany & Company became apprehensive regarding the transaction and requested Mrs. Spreckels to return the necklace until she could furnish satisfactory references for credit. Mrs. Spreckels in the meantime had delivered the necklace to a Mr. Barrett, who had sold it, appropriated the proceeds, and absconded. She was, therefore, unable to return the necklace to Tiffany & Company, nor was she able to pay for the same. At the time of the purchase of the necklace Mrs. Spreckels was

residing in London and had with her Geraldine, age four years, the daughter of herself and her husband, John D. Spreckels, Jr. Mr. Spreckels was residing in California. They had not been actually divorced, although they were then living separate and apart, and on March 17th of the following year an interlocutory decree of divorce between them was entered by the superior court of the city and county of San Francisco. On learning that Mrs. Spreckels was unable to return the necklace, Tiffany & Company threatened to have her and Barrett prosecuted for conspiracy to defraud. As a result of conferences held immediately after Tiffany & Company learned that Mrs. Spreckels was unable to return the necklace, in which Mrs. Spreckels and her solicitors met representatives of Tiffany & Company and its solicitors, two cablegrams were dispatched to Mr. Spreckels in California. One of these cablegrams was signed by Mrs. Spreckels and the other by Mr. Price, the managing clerk of Crosse & Sons, her solicitors. While these cablegrams were signed by the parties as just stated, they were framed in a large measure by the solicitors of Tiffany & Company, present at the conference. These cablegrams were sent June 18, 1920, and one signed by Mr. Price was as follows: "Your wife is implicated in connection with expensive jewelry alleged to have been obtained from Tiffany by conspiracy and stolen from her. She is threatened with prosecution unless satisfactory arrangements are made and desires your presence or help for her protection, as she states she is penniless. Please cable." The following is a copy of the cablegram sent by Mrs. Spreckels: "To save me from criminal prosecution must have money or guarantee immediately. Have been drawn into this by a scoundrel who has bolted with the pearls. Consequences terrifying for me and disastrous to the family. For everyone's sake, cable or arrange with Tiffany, New York. Position desperate, keep silent to mother and for God's sake come over to me and Geraldine and help us to obtain redress from thief."

Spreckels received these cablegrams in California and, after replying to them, left for London immediately, arriving there about the twelfth day of August, 1920. He immediately went into conference with Mrs. Spreckels and her solicitors and with representatives of Tiffany & Company and their

solicitors. He asked for and was given "the history of the whole matter concerning the pearl necklace." They discussed the chances of recovering the necklace or its value from Barrett, but finally concluded that he was so hopelessly involved that he could do nothing toward returning the pearls or their value, even if they were able to ascertain his whereabouts. A warrant for his arrest was issued, but it does not appear that it was ever served, probably for the reason that the officers were unable to apprehend him. In these conferences and interviews with the representatives and solicitors of Tiffany & Company, after his arrival in London, Spreckels made certain statements and admissions upon which appellant relies, in addition to the writing signed by him and later referred to, in support of its claim for a judgment in its favor in this action. A Mr. Feaveryear, one of the London managers of Tiffany & Company, testified that "J. D. Spreckels, Jr., then stated he proposed to go to Venice to see Mrs. Barrett, and to inform her that the necklace must either be restored to my firm or he would apply for a warrant for her husband's arrest, and should the money or the jewelry not be forthcoming he would then see what further steps could be taken to discharge the indebtedness to my firm." Mr. Feaveryear also testified that on another occasion Mr. Spreckels "stated he was going to take his wife back to America, and as she had a wonderful voice and was a very clever dancer, she was to be trained for the stage and he would see she paid my firm's account off by installments." Mr. Fox, another representative of Tiffany & Company, testified: "On the 15th September, Mr. Spreckels called at 221 Regent street and stated he wished to have an agreement prepared between his wife and himself for payment of the debt to us, and also as to the custody of their child, and he desired our solicitors to draw up this agreement." The result of this interview was that Mr. Fox and Mr. Spreckels went to the office of Adam Burn & Son, solicitors, where there was prepared by said solicitors a certain writing in duplicate, one copy of which was signed by Spreckels and was left with Adam Burn & Son and the other was retained by Mr. Spreckels. Neither copy was signed by Mrs. Spreckels. This writing was as follows:

"Memorandum of Agreement made this twentieth day of September, One thousand nine hundred and twenty Between John D. Spreckels Junior of San Francisco in the United States of America (temporarily residing in London) of the one part, and Syida Spreckels, his wife of the other part, Whereas the said Syida Spreckels on or about the third day of June One Thousand nine hundred and twenty purchased from Messrs. Tiffany & Co. of 221 Regent Street in the County of London a Pearl Necklace for Sixteen Thousand five hundred pounds which amount she is at the present time unable to pay And Whereas there have been various interviews between the parties hereto and the Representative in London of the said firm of Tiffany & Company as to the manner in which the debt shall be discharged, Now It Is Hereby Agreed Between the parties hereto:—

"1. That she the said Syida Spreckels shall discharge the debt by payment to Messrs. Tiffany & Company of the sum of Thirteen hundred and seventy-five pounds on the twenty-fifth day of December One thousand nine hundred and twenty and the balance by installments of Thirteen Hundred and seventy-five pounds each on the twenty-fifth day of March, the twenty-fourth day of June, the twenty-ninth day of September and the twenty-fifth day of December in every year until the full amount of Sixteen thousand five hundred pounds is paid.

"2. In the event of default being made in payment of any instalment, the said John D. Spreckels agrees to accept full responsibility for and will discharge the said debt or so much thereof as shall remain owing and for this purpose will arrange direct with Messrs Tiffany & Company.

"3. Should default in payment of any installment as aforesaid be made and the said John D. Spreckels be called upon to discharge the debt, then and in such case the said Syida Spreckels agrees to renounce all claim to the custody of their child Geraldine in his favour and will undertake not to approach or attempt to see the said child without his permission.

"4. It is Further Agreed between the parties hereto that one part of this agreement signed by the said Syida Spreckels shall be retained by the said John D. Spreckels and that the part signed by the said John D. Spreckels shall

be retained by the said firm of Tiffany & Company until the debt is discharged.

"JOHN D. SPRECKELS, JR.

"Witness to the signature of
John D. Spreckels, Junior
    "RODDAM W. BURN
        "6, Bell Yard
"Doctors Commons, London
        "Solicitor."

The signing of this writing by Spreckels appears to have closed negotiations between the Spreckels and Tiffany & Company. Spreckels returned to California, where he met his death on August 8, 1921. Prior to this time, and on the seventeenth day of March, 1921, as we have before stated, an interlocutory decree of divorce had been granted the said Spreckels by the superior court of the city and county of San Francisco. His death, therefore, occurred before the entry of the final decree of divorce. Nothing was paid Tiffany & Company for the necklace, and after the appointment and qualification of the executors of his last will and testament, Tiffany & Company presented its claim amounting to $80,350 against said estate for the purchase price of said necklace to the said executors, which claim was rejected and within the time limited by the provisions of the code this action was instituted on said claim against said executors to recover said amount of $80,350 from the estate of said deceased. The trial court rendered judgment in favor of the defendants in the action and the plaintiff has appealed therefrom.

[1] As stated by appellant in his brief the issues raised by respondents at the trial were: First, that the agreement was one for the benefit of a third person and therefore, under English law, was not enforceable. Second, that the obligation evidenced by the agreement, if any, was secured by menace, coercion and duress exercised by or on behalf of appellant. The conclusion we have reached in this case renders it unnecessary for us to decide the question whether the agreement relied upon by appellant was for the benefit of a third person and therefore not enforceable under the English law, being the first issue above mentioned. We are satisfied that the assent by John D. Spreckels, Jr., to any agreement

entered into by him, whether oral or written, to answer for the debt of Mrs. Spreckels was procured by the wrongful use of fear, induced by the threats of appellant, its representatives and solicitors, to prosecute Mrs. Spreckels along with Barrett for conspiracy to defraud appellant out of said necklace of pearls in case said pearls were not returned, or satisfactory arrangements made for their payment. No citation of authority is necessary to support the proposition that a contract procured by means of threats of this character is illegal and voidable, and therefore unenforceable against the promisor. This principle of law is conceded by appellant. The leading case upon that subject in this state is the case of *Morrill* v. *Nightingale,* 93 Cal. 452 [27 Am. St. Rep. 207, 28 Pac. 1068], where this court said, on page 455: "The consent of a party to a contract must be free, and it is not free when obtained through duress or menace. Section 1569 of the Civil Code declares duress to consist in the 'unlawful confinement of the person of the party, or of the husband or wife of such party,' etc., or 'the confinement of such person, lawful in form, but fraudulently obtained.' Section 1570 provides, menace consists in a threat of the duress above specified, or of a threat of injury to the character of any such person. In this case there was no arrest and confinement, hence no duress; but the history of the transaction, as disclosed by the findings, clearly indicates threats of imprisonment upon a charge of embezzlement, which, in effect, necessarily were threats of injury to the character of defendant Nightingale, and consequently a menace. The court finds that the contract and notes were executed under the influence of such menace, and such being the fact, the defendant's free consent to the execution thereof was never gained. . . . " That case was approved by this court in the case of *People* v. *Beggs,* 178 Cal. 79, 84 [172 Pac. 152], where the court uses the following pertinent language: "If, instead of paying the two thousand dollars, Da Rosa under the circumstances shown to exist, had given his note and a mortgage securing the same, then, under the authority of the case cited, payment thereof could not have been enforced, the reason therefor being that execution of the security was procured by the wrongful use of fear induced by the threat to prosecute him for the crime out of which the indebtedness arose. If it be a wrongful use of fear in

the one case, is it not likewise an equally wrongful use of fear in the instant case?''

The above rule applies with equal force when the subject of the threat is the wife of the person whose assent to an agreement is secured as a result of such threats (13 Cor. Jur. 404, sec. 325).

In the present action the trial court found as a fact that the writing of September 20, 1920, was signed by John D. Spreckels, Jr., because of said threats and to save his wife from criminal prosecution threatened by appellant. That the evidence was sufficient to support this finding we think must be conceded. The two cablegrams already referred to and which were practically prepared by the solicitor of appellant can have no other meaning or significance. The evidence shows without conflict that they were sent only after the insistent demands by the representatives of appellant that Mrs. Spreckels communicate with her husband for assistance, and their contents is a correct reflection of appellant's attitude both before and after the cablegrams were sent.

In addition to these cablegrams the evidence of Mr. Crosse, solicitor for Mrs. Spreckels, and of his managing clerk, Mr. Price, shows that repeated threats were made by Mr. Burn, appellant's solicitor, that Mrs. Spreckels would be arrested for conspiracy to defraud his client unless the necklace was restored or satisfactory arrangements made for the payment thereof. Mr. Price testified that: ''The first conversation was on the 17th of June, 1920, at the Washington Hotel, Curzon street, London, with a representative of Messrs. Tiffany's, whose name I do not know, and Mr. R. W. Burn, their solicitor. The whole position was discussed and Mr. Burn urged Mrs. Spreckels, who was present, to communicate with her husband for assistance. He informed me that failing satisfactory arrangements being made they would have no alternative but to prosecute Barrett and Mrs. Spreckels for alleged conspiracy. After discussing the matter with Mrs. Spreckels she ultimately consented to do so, although it was against her wish.'' It will be noted that this conversation took place on June 17th and the cablegrams were sent on the following day. Mr. Price further testified in answer to interrogatory No. 16: ''A. Yes; I repeat what I have above stated, that they said they would prosecute Barrett and Mrs. Spreckels. . . . Interrogatory No. 24: Referring to page

4 of said 'Exhibit B' please state who, if anyone, informed you that they had instructions from Messrs. Tiffany to apply for a warrant for the arrest of both Barrett and Syida Spreckels. A. Yes; I was informed by Mr. R. W. Burn. Interrogatory No. 25: Please state the name of the person who made said statement to you, and the date on which it was made. A. Mr. Roddam W. Burn. The date was the 17th June, 1920, and on later days on the telephone."

Mr. Crosse testified: "The claim made by Messrs. Tiffany & Company was for the return of the jewels or payment of £16,000, and in default of either of those things they would prosecute Mrs. Spreckels. . . . It was at Messrs. Tiffany's office in Regent street, London. I cannot remember who was there, except that Mr. Roddam W. Burn, the solicitor, was there; but I think there were about half a dozen representatives of Messrs. Tiffany present. The conversation was what I have already stated in my answer to Interrogatory No. 14, that unless satisfactory arrangements were made, they would prosecute Mrs. Spreckels.

"Interrogatory No. 17. If you had more than one conversation with Adam Burn & Son, or Roddam W. Burn, please state whether any of them were by telephone. A. Yes; I did have several conversations by telephone with Messrs. Roddam Burn & Son, or Roddam W. Burn, the principal, all of which were to the same effect. . . . On the 22nd June, and 2nd, 3rd, 5th, 6th and 15th July there were conversations, the effect of all of which was that if satisfactory arrangements were not made to settle the debt, they would prosecute Mrs. Spreckels; . . .

"Interrogatory No. 24. Referring to page 4 of said 'Exhibit B' please state, who, if anyone, informed you that they had instructions from Messrs. Tiffany to apply for a warrant for the arrest of both Barrett and Syida Spreckels. A. It was Mr. Roddam W. Burn who informed me to that effect.

"Interrogatory No. 25. If your response to Interrogatory No. 24 is in the affirmative, please state the name of the person who made said statement to you, and the date on which it was made. A. This was on the 13th September, 1920, at Messrs. Tiffany's office in Regent street, London. It was Mr. Roddam W. Burn."

The evidence further shows that on the arrival of John D. Spreckels, Jr., in London, he asked for a "history of the

whole matter concerning the pearl necklace," and he was given "full details and particulars." It can hardly be imagined that in a rehearsal of the history of the events surrounding the purchase, loss, and attempted recovery of the necklace mention would not have been made of the frequent and repeated threats of appellant to prosecute Mrs. Spreckels unless arrangements were made satisfactory to appellant to settle the debt incurred in the purchase of the pearls. These threats were stressed in the two cablegrams sent to Spreckels, and were undoubtedly depended upon, by all parties concerned in preparing or sending them, to move Spreckels to come to his wife's assistance. The knowledge that his wife, with their minor daughter in her possession, was liable to be made the subject of a serious criminal prosecution was undoubtedly the impelling cause which sent John D. Spreckels, Jr., to London to render them help and assistance. And when the evidence shows that "full details and particulars" of the transaction were given him on his arrival, the only reasonable inference to deduct from such evidence is that he was fully advised of the determined purpose of the appellant, expressed on various occasions to Mrs. Spreckels and her solicitors, to hold Mrs. Spreckels criminally liable for the loss of the pearls. Spreckels was in no way responsible to appellant for the purchase price of the pearls, either legally or morally, much less was he in any way liable for their loss. He showed no particular concern for the mere business affairs of his wife. The parties were estranged and had been living apart for some time, and he may have looked upon any mere financial transaction to which she was a party with unconcern and indifference. He was, however, naturally solicitous of the good name of himself and family, and would desire to protect it from the disgrace that would result from a criminal prosecution of one of its members. Besides, his daughter of tender years was with her mother, and the arrest and imprisonment of the mother might result in most serious consequences to the child. It was these considerations, as shown by the evidence, and these alone, in our opinion, which prompted John D. Spreckels, Jr., to make the oral and written agreements by which, the appellant now claims, he obligated himself to answer for the debt of his wife. Appellant contends that even if, at the inception of his connection with this affair, the threats of prosecu-

tion influenced Spreckels' action, yet three months intervened between the sending of the cablegrams and the signing of the agreement on September 20th, during which time, appellant claims, the evidence shows that no suggestion was made by any person that Mrs. Spreckels would be prosecuted. Conceding this last statement to be true, it was for the trial court to determine the weight and effect of the cablegrams upon the mind of Spreckels at the time he signed the writing or made the oral promises relied upon by appellant. Besides, as we have already shown, Spreckels, on arriving in London on the twelfth day of August, 1920, was fully informed of all the details and particulars relating to the necklace. Furthermore, the testimony of Mr. Crosse, the solicitor of Mrs. Spreckels, shows that Mr. Burn, representing appellant, stated to him on September 13th, 1920, just seven days before the written agreement was signed, that he had instructions from Tiffany & Company to apply for a warrant of arrest of both Barrett and Syida Spreckels. It is only reasonable to conclude that Mr. Crosse communicated this statement to his client, and she in turn communicated it to Spreckels. Particularly are we justified in drawing this conclusion from the evidence when the sole purpose of Mrs. Spreckels in sending for her husband, and of the latter in traveling from California to London, was to forestall any criminal proceeding against his wife. As we have already stated, the foregoing evidence as to the threats of prosecution made by the representatives of the appellant against Mrs. Spreckels is uncontradicted. Two of these representatives of appellant, Mr. Fox and Mr. Feaveryear, who, with Mr. Burn, the solicitor, acted for appellant in practically all of its dealings with Mrs. Spreckels, were witnesses in this case, their evidence having been taken by means of depositions. Neither of them denies any of the statements made by respondent's witnesses as to the nature of the threats or that such threats were made as testified to by respondent's witnesses. Mr. Burn, who probably could have thrown more light upon the subject than anyone else on behalf of appellant, does not appear to have been a witness in the action. Just why he was not made a witness, or his deposition was not taken, the record fails to disclose. The trial court having found that the assent of Spreckels to the agreement, which is the basis of this action, was procured by means and

as the result of threats made by appellant to prosecute Mrs. Spreckels, and the evidence in support of such findings being not only sufficient but practically uncontradicted, this court has neither the authority nor the inclination to disturb the action of the trial court in this regard.    There is some claim made by appellant, in discussing other questions arising on this appeal, that besides the writing of September 20, 1920, Spreckels made oral promises that he would pay the claim of Tiffany & Company against Mrs. Spreckels, and that even if he is not bound by said writing, he is liable under his oral promises.    In so far as these oral statements, or any oral agreement arising out of them are concerned, the oral agreement is in no better position than the written agreement, when considered in reference to the threats of prosecution made by the appellant.    Any agreement made by Spreckels, either oral or written, the testimony in this case discloses, was made as the result of said threats of criminal prosecution against Mrs. Spreckels.

[2]    There is another reason in our opinion why the agreement made by Spreckels was without binding effect upon him or upon his estate, and this is that there was no valid consideration to support any agreement, either written or oral, made by him.    In the first place, as we have already seen, the writing claimed by appellant to be an agreement was not signed by Mrs. Spreckels, and it is doubtful whether she ever knew that it had been signed by her husband and delivered to appellant.    Whether she knew of its existence or not there is no evidence that she ever assented to it or agreed to any of its terms.    It necessarily follows that the agreement had no binding effect upon Mrs. Spreckels, and therefore between her and Spreckels it was merely a "scrap of paper."    If it be considered as an agreement for the benefit of Tiffany & Company, there is still no consideration to support such an agreement.    Tiffany & Company parted with nothing of value, neither did it suffer any detriment by any transaction had between it and John D. Spreckels, Jr.    There is no semblance of a claim that it parted with anything of value in consideration of any contract or agreement made by Spreckels. The only possible claim it can make is that it suffered a detriment by forbearing to sue Mrs. Spreckels for the purchase price of the pearls and agreeing to accept payment of their purchase price in installments as set out in the writing

signed by Spreckels. Had Tiffany & Company by any valid agreement bound itself not to sue upon its claim against Mrs. Spreckels for a period of time, no matter how brief, in consideration of Spreckels agreeing to pay its claim against Mrs. Spreckels, such an agreement on its part would have been sufficient to support Spreckels' engagement to pay their claim, provided his assent thereto had not been gained by reason of threats of prosecuting Mrs. Spreckels (*Whelan* v. *Swain*, 132 Cal. 389 [64 Pac. 560]; *Humboldt Sav. etc. Soc.* v. *Dowd*, 137 Cal. 408 [70 Pac. 274]). There is no evidence, however, of any such an agreement by Tiffany & Company. The writing of September 20, 1920, was prepared by the solicitors of Tiffany & Company and contains no references to any engagement by Tiffany & Company to extend the time of payment of their claim against Mrs. Spreckels or to accept the agreement of the Spreckels to pay the same in installments. So far as this writing affected the rights of Tiffany & Company to proceed against Mrs. Spreckels, it (Tiffany & Company) could have instituted action the day the writing was signed against Mrs. Spreckels to recover the purchase price of the pearls. The fact that it did forbear to sue without any agreement of forbearance does not constitute a consideration (*Estate of Thomson*, 165 Cal. 290 [131 Pac. 1045]; *Commercial Bank* v. *Redfield*, 122 Cal. 405 [55 Pac. 160, 772]; *Shadburne* v. *Daly*, 75 Cal. 355 [18 Pac. 403]). The agreement, therefore, on the part of Spreckels to pay the claim of his wife, and this applies to any oral promises made by him as well as to the purported written agreement, was without any consideration and imposed no obligation upon him or upon his estate to pay the same (*Chaffee* v. *Browne*, 109 Cal. 211 [41 Pac. 1028]; *Lagomarsino* v. *Giannini*, 146 Cal. 545 [80 Pac. 698]). As was said in the former of these cases, quoting from *Bayler* v. *Commonwealth*, 40 Pa. 37 [80 Am. Dec. 551], where the wife had assumed to secure her husband's indebtedness under circumstances similar to those in the present action: " 'No new consideration was given at the time it was executed. The wife received nothing, the husband received nothing, the creditor parted with nothing. The instrument was, therefore, no more than a collateral security given for an old debt of the husband.' "

[3] The further contention is made by respondents that even if the written agreement of September 20, 1920, between

Spreckels and wife were in all other respects legal, the agreement is rendered invalid by reason of the nature of the promise of Mrs. Spreckels contained therein "to renounce all claim to the custody of their child Geraldine in his (Spreckels') favor," the sole consideration of Spreckels' agreement to her to accept responsibility for the payment of appellant's claim. This contention, we think, cannot be sustained. Parents have a legal right to contract with each other as to the custody and control of their offspring (*Sargent* v. *Sargent,* 106 Cal. 541 [39 Pac. 931]; *Anderson* v. *Anderson,* 56 Cal. App. 87 [204 Pac. 426]; *Van der Vliet* v. *Van der Vliet,* 200 Cal. 721 [254 Pac. 945]). This right, however, is subject to the control of the court in proceedings wherein the welfare of the child is involved (*Black* v. *Black,* 149 Cal. 224 [86 Pac. 505]). But as between the parents, themselves, a promise by one parent that the other may have the custody and control of their child is legal and is a sufficient consideration to support an agreement on the part of the parent in whose favor the promise is made.

The written agreement, and any oral agreement made by Spreckels to accept responsibility of his wife's debt to appellant, for the reasons that the same were procured by menace and are unsupported by any valid consideration, are invalid and unenforceable against the estate of said deceased.

The judgment is affirmed.

Richards, J., Seawell, J., Shenk, J., Waste, C. J., Langdon, J., and Preston, J., concurred.